LAURA M. ROBB, State Bar No. 219677
DEBORAH S. REAMES, State Bar No. 117257
Earthjustice
426 17th Street, 5th Floor
Oakland, CA 94612
Telephone: 510/550-6725
Facsimile: 510/550-6749

TRENT W. ORR, State Bar No. 077656
953 Clayton Street, #5
San Francisco, CA 94117
Telephone: 415/665-2185
Facsimile: 415/665-2592

Attorneys for Plaintiffs

KATHERINE S. POOLE, State Bar No. 195010
HAMILTON CANDEE, State Bar No. 111376
Natural Resources Defense Council
111 Sutter Street, 20th Floor
San Francisco, CA 94104
Telephone: 415/875-6100
Facsimile: 415/875-6161

Attorneys for Plaintiff NRDC

ORIGINAL FILED
FEB 15 2005
RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

EMC

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

NATURAL RESOURCES DEFENSE COUNCIL, CALIFORNIA TROUT, BAYKEEPER AND ITS DELTAKEEPER CHAPTER, FRIENDS OF THE RIVER, and THE BAY INSTITUTE, all non-profit organizations,

Plaintiffs,

v.

GALE A. NORTON, in her official capacity as Secretary of the Interior; and STEVEN A. WILLIAMS, in his official capacity as Director, U.S. Fish and Wildlife Service,

Defendants.

Case No. C 05 0690

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COMPLAINT                                          1

# INTRODUCTION

1. On July 30, 2004, the U.S. Fish and Wildlife Service ("Service") issued a biological opinion (the "Biological Opinion") regarding the long term future operations of the massive Central Valley Project ("CVP") and State Water Project ("SWP"), which are operated by the federal Bureau of Reclamation ("Bureau") and the state Department of Water Resources ("DWR"), respectively. The Biological Opinion concluded that the proposed operations would neither jeopardize the survival of the Delta smelt, a fish endemic to California's Delta and protected under the Endangered Species Act ("ESA"), nor cause adverse modification of the Delta smelt's critical habitat, even though the proposed operations would dramatically alter the Delta's hydrology and aggravate some of the very threats that lead to the Delta smelt's ESA listing in the first place. The Service's analysis, while politically convenient, violated the most basic standards of rational decisionmaking and failed the ESA's core purposes of preventing extinctions and recovering threatened species.

2. The CVP and SWP are among the largest water storage and diversion projects in the world. Together, the CVP and SWP annually manage more than 11 million acre feet of water. That is roughly enough water to supply all of the water requirements for fifteen cities the size of Los Angeles. As part of their operations, the two projects run massive pumping facilities in the Delta, which presently export an average of 1.6 to 2.0 *trillion* gallons of water annually out of the Delta for delivery to irrigation agencies and other water users further south. The existing operations of these pumps have altered natural flow patterns in the Delta and San Francisco Bay and even cause the San Joaquin River — one of the San Francisco Bay-Delta estuary's two major tributaries — to flow backwards. Now, as set forth in a June 30, 2004 document known as the "Long-Term Central Valley Project Operations Criteria and Plan" ("OCAP"), the Bureau and DWR plan to significantly expand these existing operations of the CVP and SWP.

3. The Delta smelt is a two- to three-inch-long fish endemic to the Delta, an estuary at the confluence of the Sacramento and San Joaquin Rivers in northern California. Unlike many fishes, the Delta smelt typically lives just one year, making it particularly vulnerable to short-term environmental fluctuations and threats. Extinction of the Delta smelt could result from just a single year of spawning failure or from just a few consecutive years of high fish kills or poor spawning or

rearing conditions. The existing operations of the CVP and SWP have been major factors in the Delta smelt's decline and its listing under the Endangered Species Act. The Service nevertheless bowed to intense political pressure and, in July 2004, rendered its Biological Opinion that the CVP's and SWP's proposed intensification of operations will not jeopardize the survival of the Delta smelt or cause adverse modification of the fish's critical habitat. In rendering this opinion, the Service simply ignored factors that Congress required the Service to consider and reached a conclusion based on political expedience rather than sound science. In particular, this decision ignored the recent decline of smelt abundance and the correspondence between periods of decline and increases in exports.

4. By this action, plaintiffs Natural Resources Defense Council, Inc.; California Trout; Baykeeper and its Deltakeeper Chapter; Friends of the River; and The Bay Institute (hereinafter collectively "Plaintiffs") challenge the Service's July 30, 2004 Biological Opinion. Plaintiffs allege, among other things, that the Biological Opinion is legally invalid because it failed to analyze the factors Congress required be considered (including whether the proposed CVP and SWP operations would cause adverse modification of Delta smelt habitat in a manner that affects the recovery of the species) and reached its "no jeopardy" conclusion by relying on an undefined promise of "adaptive management" that provides no assurance of protection whatsoever.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States); 16 U.S.C. § 1540(c) (action arising under the Endangered Species Act); and 5 U.S.C. §§ 702, 703, and 706 (judicial review of federal agency actions).

6. The Secretary has issued a final Biological Opinion on the effects of the OCAP on Delta smelt pursuant to 16 U.S.C. § 1536(b). Plaintiffs assert that the Biological Opinion is arbitrary and capricious, an abuse of discretion, and not in accordance with law within the meaning of 5 U.S.C. § 706(2). An actual controversy therefore exists between the parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

7. Venue lies in this judicial district by virtue of 28 U.S.C. § 1391(e). A substantial part

of the events or omissions giving rise to the claim occurred here.  In particular, a substantial portion of the Delta smelt's critical habitat lies in Contra Costa County, and the CVP's Tracy Pumping plant, at which substantial mortality of Delta smelt occurs, is located in Alameda County.  Three of Plaintiffs maintain offices and reside within this judicial district, as set forth in paragraphs 9-12, below.

**INTRADISTRICT ASSIGNMENT**

8.   This action should be assigned to the San Francisco or Oakland Division pursuant to Civil L.R. 3-2(d) because a substantial part of the events or omissions giving rise to the claim occurred in Alameda and Contra Costa Counties.

**PARTIES**

9.   Plaintiff NATURAL RESOURCES DEFENSE COUNCIL ("NRDC") is a non-profit environmental organization with more than 480,000 members nationwide, including more than 90,000 members in California and thousands of members in Alameda and Contra Costa counties. NRDC maintains an office in San Francisco, California.  NRDC's purpose is to safeguard the Earth: its people, its plants and animals and the natural systems on which all life depends.  The organization works to restore the integrity of the elements that sustain life — air, land and water — and to defend endangered natural places.  NRDC seeks to establish sustainability and good stewardship of the Earth as central ethical imperatives of human society and strives to protect nature in ways that advance the long-term welfare of present and future generations.  For more than two decades, NRDC has advocated extensively for the protection of the nation's waterways and wildlife, including the Delta smelt.  In July 2003, NRDC submitted formal comments and scientific information to the Bureau raising concerns about the impacts of the Bureau's then-proposed OCAP on Delta smelt, and in July 2004, NRDC submitted formal comments and scientific information to FWS regarding the impacts of the Bureau's OCAP on Delta smelt, during the pendency of the ESA consultation that resulted in the Biological Opinion challenged here; a copy of NRDC's July 11, 2003 letter to the Bureau and its July 28, 2004 letter to the Service are attached hereto as Exhibits 1 and 2 and incorporated by reference.  In addition, NRDC has long worked to protect the San Francisco Bay-Delta estuary and the fish for which it provides habitat, including the Delta smelt, in

non-litigation settings. For example, NRDC was involved in the development of, and actively supported the enactment of, the Central Valley Project Improvement Act; participated deeply in the negotiation of the record of decision for the CALFED Bay-Delta Program, the mission of which is to develop and implement a long-term comprehensive plan that will restore ecological health and improve water management for beneficial uses of the Bay-Delta estuary; and currently sits on the CALFED public advisory committee.

10. Plaintiff CALIFORNIA TROUT ("CalTrout") is a non-profit conservation corporation organized in 1971 under the laws of the State of California with its principal place of business in San Francisco, California. CalTrout's mission is to protect and restore wild trout and steelhead and their waters throughout California and other native fish species such as the Delta smelt. CalTrout fulfills its mission by protecting wild trout habitat throughout California, and the native biodiversity associated with this riparian habitat, including the Delta smelt and other vulnerable species. In fulfilling its mission to protect freshwater habitat and its biodiversity, including native fish, CalTrout has participated in watershed protection and restoration efforts such as preserving and restoring the habitat of California's unique state fish, the California golden trout, working with the California Department of Fish and Game and other key partners to establish a statewide steelhead trout and a northern California coho salmon recovery plan, restoring San Francisco's Lake Merced and the Eastern Sierra's Mono Lake, and mobilizing concerned anglers to protect and restore wild trout waters in the Mount Shasta and Mammoth Lakes regions of the state. CalTrout participates regularly in administrative processes and in the past year has commented on the National Forest Management Act, Changes in Forest Practices, Roadless Rules, the Sierra Framework, Bureau of Land Management Grazing regulations, California Department of Fish and Game Trout Strategic Plan, and changes proposed for Clean Water Act. CalTrout members support the conservation of entire watersheds and all of their associated biodiversity, as well as the effective implementation and enforcement by government regulatory agencies of planning and conservation laws, like the Endangered Species Act, that relate to the protection of these watersheds and their native biodiversity. CalTrout represents nearly 6,000 recreational anglers, of whom more than 2,000 live within a one-hour drive of the Delta and regularly utilize these riparian areas for fishing,

photography, and hiking and to seek aesthetic relief from the urban environments of the Bay Area.

11. Plaintiff BAYKEEPER AND ITS DELTAKEEPER CHAPTER ("Baykeeper") is a regional non-profit public benefit corporation organized under the laws of the State of California. Baykeeper's mission is to protect and enhance the water quality of the San Francisco Bay-Delta estuary and its watershed for the benefit of its ecosystems and human communities. Through its three on-the-water chapters, Baykeeper patrols thousands of miles of waterways throughout the Bay, Delta and Petaluma River, investigating pollution problems and bringing enforcement actions against polluters directly when necessary. The Deltakeeper Chapter of Baykeeper carries out this mission on the Sacramento-San Joaquin River Delta and its tributaries in California's Great Central Valley. Founded in 1989, Baykeeper is the premier legal and policy advocate for the San Francisco Bay and Delta and their vast watershed, from the high Sierra to the Golden Gate. Using targeted administrative and legal advocacy before the state and regional regulators, Baykeeper plays a lead role in developing sound and legal standards, permits, and regulations. A key area of the group's focus is ensuring that state and federal environmental laws are implemented properly and enforced. Where necessary, Baykeeper initiates enforcement actions on behalf of its members and itself. Baykeeper's main office is in San Francisco, California. The Deltakeeper Chapter office is located in Stockton, California. Baykeeper has approximately 1,200 members who reside in the San Francisco Bay-Delta watershed of whom approximately 150 belong to the Deltakeeper Chapter.

12. Plaintiff FRIENDS OF THE RIVER ("FOR") is a non-profit organization organized under the laws of the State of California with its primary place of business in Sacramento, California. FOR was founded in 1973 to preserve, protect, and restore free flowing rivers, streams, and watersheds throughout California and the West through public education and the implementation of environmentally sound public policy and law, including the Endangered Species Act. More than half of FOR's approximately 10,000 members live along California's north and central coasts and the associated bay and river areas that contribute to Delta smelt habitat. FOR accomplishes its goals of protecting free flowing rivers and watersheds by working for the protection of the wildlife, like Delta smelt, that depend upon and contribute to these riparian ecosystems and whose health and viability are intimately linked to the overall health of the free flowing river

ecosystems to which they belong.

13. Plaintiff THE BAY INSTITUTE OF SAN FRANCISCO ("TBI") is a non-profit conservation organization incorporated under the laws of California and dedicated to the preservation, protection, and restoration of the Bay-Delta and its fish and wildlife resources. TBI's headquarters are located in Novato, California. TBI and its over 2,500 members have a direct interest in the survival and perpetuation of fish species and other aquatic resources that are dependent upon the Bay-Delta. Most of TBI's members live near the Bay-Delta, and many rely on this region for their livelihood in the commercial and sports fishing and boating industries. In addition, many TBI members regularly visit and use the Bay-Delta for recreational experiences and aesthetic enjoyment. TBI regularly participates in administrative and judicial proceedings on behalf of its members to protect, enhance, and restore declining populations of native California fishes, including Delta smelt, throughout the Bay-Delta watershed. Since its founding in 1981, TBI has pioneered an advocacy and education approach to Bay-Delta issues that considers not just the Bay-Delta, but the entire ecosystem related to the Bay-Delta as a single, interdependent watershed. TBI's efforts therefore encompass a region extending from the headwaters of the Sacramento and San Joaquin River systems to the Golden Gate. In 1992, TBI and other environmental organizations sued the U.S. Fish and Wildlife Service over its failure to list the Delta smelt under the Endangered Species Act, and since then TBI has carefully monitored the federal government's efforts to protect this species. TBI was one of three environmental organizations that negotiated the historic 1994 Bay-Delta Accord, which forged a consensus among the state and federal governments, and environmental, agricultural and urban interests to achieve improvements in the water quality of the Bay-Delta. The 1994 Bay-Delta Accord also set in motion a joint federal-state process for establishing long-term solutions to ongoing degradation of the Bay-Delta, known as CALFED, in which TBI has been heavily engaged. In July 2003, TBI submitted formal comments and scientific information to the Bureau regarding the impacts of its then-proposed OCAP on Delta smelt.

14. Plaintiffs and their respective members have been and will continue to be actively involved in efforts to protect and restore Delta smelt to the Delta. Among other things, they have written to numerous federal, state, and local agencies and officials to urge increased protection for

the Delta smelt and its habitat.

15. Plaintiffs and their respective members live and/or work in communities near or on the Delta. In addition to advocating for protections for the Delta smelt, members of the Plaintiff organizations, all environmental conservation or fishing organizations, are active participants in the life of the Delta. Individual members of each organization frequently visit the Delta, critical habitat for the Delta smelt, to use and appreciate the Delta ecosystem. The health and survival of the Delta smelt species is considered indicative of the health of the Delta itself. *See* U.S. Fish and Wildlife Service, Recovery Plan for the Sacramento-San Joaquin Delta Native Fishes at 1 (Nov. 26, 1996). Plaintiffs' use of the Delta for educational and recreational activities, such as hiking, boating, bird watching, swimming, and fishing, would be detrimentally affected by the decline of the Delta smelt and the corresponding decline in the health of the Delta. Plaintiffs and their members regularly derive scientific, educational, and conservation benefit and enjoyment from the existence of the Delta smelt and will continue to do so by regularly engaging in scientific, education, and conservation activities involving the Delta smelt. These benefits and enjoyments would increase if the Delta smelt were to recover from its precarious status of being threatened with extinction.

16. Delta smelt populations will continue to decline, and the fish may soon become extinct, unless the utmost care is taken in protecting the fish's limited critical habitat in the Delta. The health of the Delta smelt population is one indicator of the overall health of the Delta. Therefore, while the extirpation of the Delta smelt from any portion of the Delta would constitute an irreparable environmental loss in and of itself, it would also indicate more generally that the health and diversity of the fish's Delta habitat had been severely degraded. These events, and the threat of these events, would deprive Plaintiffs and their members of the recreational, spiritual, professional, aesthetic, educational, and other benefits they presently derive from the Delta ecosystems.

17. The above-described aesthetic, conservation, recreational, scientific, educational, wildlife and fisheries preservation, and other interests of Plaintiffs and their respective members, have been, are being, and, unless the relief prayed for herein is granted, will continue to be adversely affected and irreparably injured by the Defendants' arbitrary and capricious issuance of a Biological Opinion that found that the anticipated operations of the CVP and SWP, as set forth in the

Operations Criteria and Plan and in the Biological Opinion's project description, would not jeopardize the survival of the Delta smelt. These injuries are actual and concrete and would be redressed by the relief sought herein. Plaintiffs have no adequate remedy at law.

18. The Defendants in this action are:

    a. GALE A. NORTON. Ms. Norton is sued in her official capacity as Secretary of the Interior. She is ultimately responsible for implementing the ESA and for ensuring that the formal consultation and Biological Opinion required for impacts to the Delta smelt from the Delta water projects under Section 7 of the ESA are completed in accordance with the letter and intent of the law.

    b. STEVEN A. WILLIAMS. Mr. Williams is sued in his official capacity as Director of the Service. He has been delegated the responsibilities of the Secretary of Interior described in the preceding paragraph. He is responsible for administering the ESA, including reviewing and approving the findings of the Delta smelt final Biological Opinion.

## FACTUAL BACKGROUND

**The Delta Smelt**

19. The Delta smelt (*Hypomesus transpacificus*) is a slender-bodied fish typically reaching just over 2 inches in length. The Delta smelt is the only native estuarine species found in the Delta that spends its entire life span in the Delta.

20. Historically, Delta smelt could be found throughout the Delta, from Suisun Bay to Sacramento on the Sacramento River and to Mossdale on the San Joaquin River. However, during the past 30 years, the population has declined by 85 percent; in 2004, delta smelt abundance was just 8 percent of the average abundance measured from 1967-1973.

21. Delta smelt typically live for only one year, and, therefore, they are particularly vulnerable to extinction resulting from atypically harsh conditions. One year where the population fails to spawn or where a high proportion of juveniles are killed could result in the extinction of the species. Similarly, increased abundance from a good year will not serve to mitigate damage to population caused by a subsequent bad year. As a result, Delta smelt are affected greatly by any disturbance to their reproductive habitat or larval nursery areas.

22. The Delta smelt live for most of their year-long life spans in the low-salinity zone at the saltwater-freshwater interface, but they migrate upstream to spawn. However, the amount and the quality of suitable habitat has declined dramatically due to Delta water diversions and exports. As freshwater is exported, the low-salinity zone shifts upstream from large-area, shallow habitats, such as Suisun Bay, to narrow, deep river channels, which are less productive and have less habitat area. This impact to the critical rearing habitat of the smelt is compounded by the disastrous levels of direct mortality that occur at the Projects' pumps: both pre-spawning adult fish moving upstream to spawn and their larval and juvenile progeny moving downstream to low-salinity rearing habitat are killed in large numbers at the Projects' fish salvage facilities and pumps.

23. The Service listed the Delta smelt as a threatened species under the ESA on March 5, 1993. The Service designated critical habitat for the Delta smelt on December 19, 1994. The critical habitat includes all waters and submerged lands within the Delta, including those at the pumping plants for the CVP and the SWP.

24. The California Department of Fish and Game has confirmed that data from the 2004 abundance measurements for the Delta smelt indicate that the species abundance is at the lowest level ever measured in over 30 years of monitoring. Population viability analysis conducted for the species indicates that the risk for extinction within the next 20 years is high. *See, e.g.,* Bennett, W.W. and K.T. Honey, *Modeling the Canary: How Do We Assess Population Viability for the Threatened Delta Smelt?*, Proceedings of the 2004 CALFED Bay-Delta Program Science Conference.

## PROCEDURAL BACKGROUND

**The Proposed Operational Changes to the Central Valley Project and the State Water Project**

25. The CVP is a federal water storage and diversion project. It is one of the largest water projects in the world, annually managing an average of approximately 9 million acre-feet of water and annually delivering an average of approximately 6.8 million acre feet of water. The CVP is comprised of approximately 20 dams and reservoirs (including some of the largest storage facilities in the State, such as Shasta Dam on the Sacramento River, the Trinity and Whiskeytown Dams, which divert water from the Trinity River to the Sacramento River for export through the

Delta, and Folsom Dam on the American River), the Tracy Pumping Plant (which draws hundreds of billions of gallons of water per year out of the Delta and into the Delta-Mendota Canal), and some 500 miles of major canals, as well as conduits, tunnels, powerplants, and related facilities.  The State Water Project is a major water storage and diversion project of the State of California that coordinates operations with the CVP and shares the use of the San Luis Reservoir, among other facilities, with the CVP.

26. As set forth in the OCAP, the Bureau proposes to further coordinate operations of the CVP and the SWP and to expand and intensify existing CVP and SWP operations in a manner that would significantly affect the hydrology of the Delta, including the hydrology of areas designated as critical habitat for the Delta smelt.   Among other things, the proposed changes to the CVP-SWP operations described in the OCAP and Biological Opinion's project description would significantly increase water exports from the Delta.

27. The Biological Opinion also purports to provide "early consultation" for operational changes that are a part of the South Delta Improvement Program ("SDIP").  These changes would include those listed above, as well as permanent barriers placed in the South Delta and further water diversions.  The Biological Opinion specifically does not consider the impacts of construction activities associated with the SDIP or the effects of other interrelated and interdependent activities.  This Biological Opinion indicates that its "early consultation" will be formalized as a final consultation when the action specific implementation plan for the South Delta is completed, assuming that the project description does not change.

28. The Bureau pressed the Service to complete ESA consultation quickly on these proposed changes, as set forth in the OCAP, in large part because the Bureau felt it needed to finish the consultation before it executed long-term CVP water supply renewal contracts with a number of irrigation interests in the Central Valley.  The Bureau intends to execute most of those water supply contracts as early as possible this year, starting in February 2005. These long-term water supply contracts, many of which have been circulated for public review, provide for the maximum delivery of far more water from the CVP than the CVP has, in recent years, been able to deliver.  In fact, the Bureau intends to substantially increase water deliveries during the life of these renewed contracts.

For example, in the Bureau's projections of water deliveries dated January 20, 2004, and attached as Exhibit 3 hereto, deliveries to the South-of-Delta Westlands Water District are anticipated to increase steadily to an average of 1.127 million acre-feet from 2026 to 2030 — a full 98 percent of the 1.15 million acre-foot total in the current Westlands contract. These planned delivery increases are inconsistent with previous statements regarding the quantity of water to be exported from the Delta. The Bureau's Biological Assessment suggests that long-term deliveries to South-of-Delta agricultural contractors will only average 58 to 61 percent of the full contract amount. The Environmental Protection Agency echoed this discrepancy in a letter dated January 25, 2005 and attached hereto as Exhibit 4, where it noted that the Bureau is contractually authorizing much higher future water deliveries than it is analyzing in environmental impact documents or has delivered in recent years. If the Bureau is to deliver the maximum quantities of water provided for in the contracts, it will need to significantly intensify CVP operations and increase its deliveries north of the Delta and its water exports out of the Delta as compared to the operations assumed and analyzed in the Biological Opinion. The Biological Opinion does not adequately consider or address the effects of these long-term water service contracts on threatened and endangered species.

29.     The Biological Opinion does not consider or reach any conclusion as to how changes to the critical habitat of Delta smelt, caused by the proposed CVP and SWP operations, as set forth in the OCAP, would adversely affect recovery of the Delta smelt.

30.     In reaching a "no jeopardy" conclusion, the Biological Opinion relies heavily on certain existing or potential future protective measures, the adequacy of which has not been demonstrated, and several of which may not be implemented in the form assumed by the Biological Opinion or at all. The Bureau has a long history of disregarding or violating such protective measures. For example, the Bureau failed to consistently meet the conservation obligations agreed upon in the Biological Opinions for the Friant Unit long- and short-term renewal contracts. In addition, in multiple years since the endangered Sacramento River winter-run Chinook salmon and the threatened Delta smelt were listed under the ESA, the Bureau and the Department of the Interior have operated the CVP and SWP in such a way that the ESA-mandated incidental take limits for both species have been exceeded.

31. Among other defects, the Biological Opinion assumes benefits to the Delta smelt from future, long-term implementation of an Environmental Water Account (EWA). The Environmental Water Account as it presently exists is a water redistribution program that maintains exports to entities with contracts for water from the Delta when protections for Delta smelt or certain other species are put into effect. At the time the Biological Opinion was signed, however, the then-existing EWA was scheduled to expire by September 2004.[1] Although the Biological Opinion assumes a future EWA, it also states that "inclusion of the EWA in this description does not constitute a decision on future implementation of the EWA." *See* Biological Opinion at 84. Any benefits to Delta smelt from any long-term EWA are, at best, speculative. Moreover, the Biological Opinion's characterization of the EWA does not agree with the description provided by the Bureau in the June 30, 2004 OCAP when requesting that the Service consult.

32. Recognizing that assumed protective measures may be inadequate and, indeed, may not even be fully carried out, the Biological Opinion provides for an "adaptive management" process under which the Bureau and certain fisheries management agencies would discuss and *potentially* agree to *further* changes in the CVP operations that affect Delta smelt through an "adaptive management" process. However, the Biological Opinion does not provide any assurance of any particular level of protection for the Delta smelt as a result of this promise of future "adaptive management."

33. The Biological Opinion's adaptive management process involves the use of a so-called "Delta Smelt Risk Assessment Matrix" as a decision-making tool intended to be used by a Working Group to monitor the effects of the CVP and SWP on the Delta smelt. The Matrix is a tool to identify when Delta smelt may be negatively affected by a project and suggest possible management strategies. The Biological Opinion generally requires that the Working Group be informed should the triggering conditions be met. However, the Biological Opinion does not require that the Working Group, or the Bureau, take any particular action if a triggering condition occurs. No particular level of protection for Delta smelt or its critical habitat is ensured.

---

[1] CALFED has temporarily extended the EWA for a three-year period; however, funding has not been secured for this entire time.

COMPLAINT                                       13

## LEGAL BACKGROUND

**Consultation under the ESA**

34. Section 7(a)(2) of the ESA requires that each Federal agency, in consultation with the Secretary,[2] ensure that any activity which it authorizes, funds, or carries out is not likely to jeopardize the continued existence of any threatened or endangered species or destroy or adversely modify any listed species' critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14 (1986).

35. An action would jeopardize a species if it reasonably would be expected to reduce appreciably the likelihood of both the survival and recovery of the species in the wild. 50 C.F.R. § 402.02 (1986).

36. Following consultation, the Secretary must issue a "biological opinion" in which she determines whether the activity is likely to jeopardize a listed species or adversely affect its critical habitat and provides a summary of the reasons for its conclusion. 16 U.S.C. § 1536(b)(3)(A). In formulating her opinion, the Secretary must use the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8) (1986).

37. The Secretary has delegated her duties under the ESA to the Service. 50 C.F.R. § 402.01(b) (1986).

**Adverse Modification of Critical Habitat under the ESA**

38. The Service has defined the phrase "destruction or adverse modification" of critical habitat in Section 7(a)(2) as:

> [A] direct or indirect alteration that appreciably diminishes the value of critical habitat for both survival and recovery of a listed species. Such alterations include, but are not limited to, alterations adversely modifying any of those physical or biological features that were the basis for determining the habitat to be critical.

50 C.F.R. § 402.02.

39. Courts have found that this definition is an impermissible interpretation of the ESA because it reads the goal of "recovery" out of the adverse modification inquiry by holding that a proposed action "adversely modifies" critical habitat only if the value of the critical habitat for

---

[2] The Secretaries of the Interior and Commerce share responsibilities under the ESA according to the type of species involved. 16 U.S.C. § 1532(15). For the Delta smelt, the Secretary of the Interior is the responsible official.
(cont'd next page)

COMPLAINT                          14

*survival* is also appreciably diminished.  *See, e.g., Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1069 (9th Cir. 2004).  The Service relied on its unlawful regulatory definition of "adverse modification" when it drafted and finalized the Biological Opinion.

40. The Biological Opinion fails adequately to consider or to render any conclusion as to whether the action on which consultation was conducted would adversely impact Delta smelt critical habitat in a manner that would adversely impact recovery of that species.  The action in question would have such an adverse impact to Delta smelt critical habitat.

**Reliance on Uncertain Measures as Basis for No Jeopardy Opinion**

41. According to Section 7(a)(2) of the ESA, the Service must "insure that any action authorized …is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of [critical] habitat of such species."  16 USC § 1536(a)(2).

42. A biological opinion must include a discussion "as to whether the action, taken together with its cumulative effects, is likely to jeopardize [the species]."  50 CFR §402.14(g)(4).  The Service has defined the "effects of the action" as "the direct and indirect effects on the species or the critical habitat."  50 CFR §402.02.  The definition goes on to define indirect effects as "those that are caused by the proposed action, … but still are reasonably certain to occur."  *Id.*

43. "Mitigation measures must be reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards."  *Center for Biological Diversity v. Rumsfeld*, 198 F.Supp.2d 1139, 1152 (D. Ariz. 2002); *Sierra Club v. Marsh*, 816 F.2d 1376, 1385 (9th Cir. 1987).

44. Reliance on the uncertain "adaptive management" and unproven future mitigation measures to conclude that the project will not put the species in jeopardy or adversely modify its critical habitat violates section 7(a)(2) the ESA.  Such reliance allows take of and potential jeopardy to smelt, and destruction or adverse modification of smelt habitat, without first insuring that the species will not be jeopardized and recovery will not be delayed or impaired.

**Failure to Consider the Entire Effects of the Action**

45. Section 7(a)(2) of the ESA and its implementing regulations require the Service to "[e]valuate the effects of the action and cumulative effects" and to render its biological opinion "as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(3), (4). The Service's regulations specify that the "actions" on which ESA Section 7 consultation is required include "all activities or programs of any kind *authorized*, funded or carried out" by any federal agency, including "the granting of . . . contracts." 50 C.F.R. §§ 402.02, 402.14 (emphasis added). The Service's regulations further define the phrase "effects of the action" to include "the direct and indirect effects of an action . . . , together with the effects of other activities that are interrelated or independent." 50 C.F.R. § 402.02 (emphasis added). "Indirect effects" are those effects "caused by the proposed action and later in time, but still reasonably certain to occur." *Id.* "Interrelated actions" are actions that are "part of a larger action and depend on the larger action for their justification." *Id.* "Interdependent actions" are actions that "have no independent utility apart from the action under consideration." *Id.* In short, the ESA requires a biological opinion to analyze the effects of the entire action authorized by the agency, without piecemealing the consultation into incremental steps.

46. FWS did not comply with this mandate in issuing the challenged Biological Opinion. Among other inadequacies, the FWS failed to consider the full effects of the action authorized in impending long-term water supply contracts, which were the chief motivating force behind the Bureau's and FWS' rush to complete the Biological Opinion, and did not consider the effects of construction activities associated with the SDIP.

**Failure to Consider the Best Available Science**

47. Section 7(a)(2) of the ESA requires consultations to be based on the best available scientific information. FWS did not adhere to that mandate in rendering the challenged Biological Opinion. Among other deficiencies, the Service wholly failed to consider the effects of global climate change. Scientific data available today predict warming in the western United States of several degrees centigrade over the next 100 years and indicate that this temperature change will

dramatically change western hydrology. The Biological Opinion did not consider these changes in evaluating the effects of future CVP and SWP operations on Delta smelt. In addition, the Service failed to consider population viability analyses indicating that the species has a high risk of extinction within the next 20 years.

**FIRST CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act**
**(5 U.S.C. § 706)**

48. Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

49. The Secretary's conclusion, in the Biological Opinion for the Coordinated Operations of the CVP/SWP, that the changes, including operational changes, and future operations will not jeopardize the continued existence of the Delta smelt and will not result in the destruction or adverse modification of the critical habitat of Delta smelt is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

50. The Biological Opinion improperly relied on an invalid definition of "adverse modification" and unlawfully failed to consider adequately or to render a biological opinion on how the actions on which consultation was undertaken would affect Delta smelt critical habitat's value for recovery of the species.

51. The Secretary's conclusion, in the Biological Opinion, that the planned operational and other changes to the CVP and SWP, and their future operations, will not jeopardize the continued existence of the Delta smelt or cause adverse modification to the Delta smelt's critical habitat has no basis in the Biological Opinion or elsewhere in the record. The Biological Opinion improperly relies on uncertain future mitigation measures and a promise of adaptive management without adequate evidence that the mitigation measures will be undertaken and will be effective, and without identifying concrete actions sufficient to ensure protection of the Delta smelt and its critical habitat as a result of any future "adaptive management."

52. The Biological Opinion failed properly to define the agency action or to consider the "effects of the action," thereby significantly underestimating and/or ignoring those effects of the entire agency action.

53. The Biological Opinion fails to consider the best available scientific information.

54. The analysis, reasoning, and conclusion of the Biological Opinion, and the Secretary's actions described herein, are arbitrary, capricious, an abuse of discretion, not in accordance with law, in excess of statutory authority, and without observance of procedure required by law, in violation of ESA Section 7 and its implementing regulations and the standards of the Administrative Procedure Act, 5 U.S.C. § 706.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Find and declare that the Secretary's issuance of the Biological Opinion, and the Biological Opinion itself, are arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2).

B. Order the Secretary to comply with the law forthwith by withdrawing its Biological Opinion and reinitiating consultation with respect to the proposed changes to and future operation of the CVP-SWP and for the proposed actions concerning the SDIP.

C. Enjoin the defendants from taking any action in reliance on the invalid Biological Opinion.

D. Retain jurisdiction over this matter until such time as the Secretary has fully complied with the Court's order.

E. Award Plaintiffs their costs of litigation, including reasonable attorney and expert witness fees.

F. Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

DATED: February ____, 2005

/s/_____
LAURA M. ROBB
DEBORAH S. REAMES
TRENT W. ORR

Attorneys for Plaintiffs


/s/_____
KATHERINE S. POOLE
HAMILTON CANDEE

Attorneys for Plaintiff
Natural Resources Defense Council